FILED
United States Court of Appeals
Tenth Circuit

May 13, 2014

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

HIGBY CRANE SERVICE, LLC;
NATIONAL INTERSTATE
INSURANCE COMPANY,

     Plaintiffs - Appellees,

v.

NATIONAL HELIUM, LLC, a Delaware
limited liability company; DCP
MIDSTREAM, LP, a Delaware limited
partnership,

     Defendants - Appellants.

No. 13-3001

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 6:10-CV-01334-JAR-GLR)

---

Lee Thompson, Thompson Law Firm, LLC, Wichita, Kansas, for Defendants - Appellants.

Tracy A. Cole (G. Andrew Marino with her on the brief), Gilliland & Hayes, LLC, Wichita, Kansas, for Plaintiffs - Appellees.

---

Before **LUCERO**, **HARTZ**, and **GORSUCH**, Circuit Judges.

**HARTZ**, Circuit Judge.

Plaintiff Higby Crane Service, LLC (Higby) entered into a Contract (the Contract) with Defendant DCP Midstream, LP (DCP)[1] that covered crane work to be done at the gas processing plant of DCP's wholly owned subsidiary National Helium, LLC (we will refer to DCP and National Helium collectively as DCP). A fire negligently started by DCP damaged Higby's crane. The other Plaintiff, National Interstate Insurance Co. (National), had issued Higby a commercial inland marine (CIM) policy covering direct physical loss to certain property. National paid Higby under the policy and Plaintiffs then sued DCP for the loss. DCP counterclaimed that Higby had breached the Contract by failing to obtain a commercial general liability (CGL) policy that would have indemnified DCP for its negligence and therefore Higby should bear the loss from the damage to the crane. The United States District Court for the District of Kansas granted summary judgment to Plaintiffs, and DCP appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand for further proceedings to determine whether the required CGL policy would have protected DCP from liability.

I. **BACKGROUND**

Under the Contract, which governed various service agreements between the

---

[1] The named parties to the Contract were Higby and Duke Energy Field Services, LP, which changed its name to DCP Midstream, LP after it executed the Contract.

parties, Higby provided crane and other services for DCP at the National Helium gas-processing plant. Unfortunately, during the night of April 19–20, 2008, a fire at the plant severely damaged Higby's crane, requiring repairs costing more than $250,000. After National paid Higby for part of the loss under a CIM policy, Plaintiffs sued DCP in Kansas state court for the repair costs. The claim alleged that "in the course of operating the National Helium plant, [DCP] negligently and/or in violation of industry standard of care, applicable rules, regulations and statutes released or vented various gases in such a manner that a vapor cloud formed and ignited resulting in damage to [the] crane." Aplt. App. at 208. The case was removed to federal court under diversity jurisdiction. DCP admitted negligence but counterclaimed against Higby, alleging that it had breached the Contract by failing to obtain required insurance.

Paragraph 9.1 of the Contract required Higby to obtain various kinds of liability insurance, including a CGL policy:

> Throughout the term of this Agreement [Higby] shall carry and pay for . . . Commercial General Liability Insurance covering liabilities for death and personal injury and liabilities for loss of or damage to property with combined single limit of not less than $3,000,000 per occurrence. This insurance must cover all operations of [Higby] required to fulfill this Agreement.

*Id.* at 71.  Paragraph 9.2 required the CGL policy to list DCP as an additional insured:[2]

"The insurance policies described above shall include [DCP], its affiliates and coventurers, and their directors, officers, and employees as additional assureds.  All insurance required hereunder and provided by [Higby] shall be primary coverage."  *Id.* at 72.  Paragraph 9.3 required the policies to waive subrogation rights against DCP.[3]

DCP moved for summary judgment.  It argued that the Contract waived any rights of Higby or National to seek recovery from DCP.  Plaintiffs filed a cross-motion for

---

[2] The terms *assured* and *insured* are generally interchangeable in the insurance context. *See Dauphin Cnty. Bar Ass'n v. Mazzacaro*, 351 A.2d 229, 231 (Pa. 1976) ("The term 'assured' is generally considered to be synonymous with the term 'insured,' . . . .); Black's Law Dictionary 879 (9th ed. 2009) (definition of *insured,* stating, "Also termed *assured*").

[3] Paragraph 9.3 states in full:
> The insurance policies described above shall, in addition be so written or endorsed to provide that the insurer shall assign and relinquish unto [DCP] (i) any right of recovery which the insurer may have or acquire against [DCP], its affiliates or coventurers, or their directors, officers, or employees for payments made or to be made under such policies, and (ii) any lien or right of subrogation which the insurer may have or acquire for payments made or to be made to any person who asserts a claim against [DCP], its affiliates or coventurers or their directors, officers, or employees.  The assignment shall be written and is intended to permit [DCP] to obtain an offset or credit against any claim filed or prosecuted against [DCP], its affiliates or coventurers, or any of their officers, directors, or employees by any person or entity to or for whom the insurer pays monies or other benefits.  Nothing herein shall limit or affect [DCP]'s rights and coverage as an additional assured under such insurance policies.

Aplt. App. at 72.

4

summary judgment asserting that the Contract did not require Higby to waive the right of subrogation under a CIM policy. Of particular importance to this appeal, DCP responded to the cross-motion by alleging that Higby had breached the Contract by failing to obtain a CGL policy and that because of the breach, Higby assumed the risk of loss and cannot collect from DCP. Plaintiffs did not produce a CGL policy[4] but contended that the Contract required only "coverage for [Higby's] liability arising from its operations" and "Higby ha[d] no liability for the fire." *Id.* at 154 (bolding omitted).

The district court granted Plaintiffs' cross-motion for summary judgment and denied DCP's motion for summary judgment. It ruled that the Contract required Plaintiffs to obtain only a liability policy covering claims brought by third parties and that because the CIM policy was not required by the Contract, "the subrogation requirement[] d[id] not apply to the CIM policy." *Id.* at 165. Further, said the court, the contractual requirement that DCP be listed as an additional insured did not help DCP because the Contract required coverage only for damages caused by Higby's operations, not DCP's. Finally, assuming that Higby breached the Contract by failing to obtain a CGL policy, the court held that this was inconsequential because the loss was covered by a policy (the CIM policy) not required by the Contract.

---

[4] At oral argument Plaintiffs asserted that Higby actually obtained the required CGL policy, but they did not raise this point in the district court or in their answer brief in this court, and there is no record support for the assertion.

DCP appealed. Although its opening brief suggests that it is challenging only the denial of its summary-judgment motion, the parties clarified at oral argument that the issue before us is the propriety of the district court's grant of summary judgment against DCP.

## II.    DISCUSSION

"We review the district court's grant of summary judgment de novo, applying the same standards that the district court should have applied." *Merrifield v. Bd. of Cnty. Comm'rs*, 654 F.3d 1073, 1077 (10th Cir. 2011) (internal quotation marks omitted). Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On review, "[w]e examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." *Merrifield*, 654 F.3d at 1077 (internal quotation marks omitted). The Contract provides that it should be interpreted under Colorado law and the parties agree that we should apply Colorado law. Summary judgment on a contract dispute should be granted if the contractual language is unambiguous. *See Gomez v. Am. Elec. Power Serv. Corp.*, 726 F.2d 649, 651 (10th Cir. 1984). The language is ambiguous "if it is fairly susceptible to more than one interpretation." *E. Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005) (internal quotation marks omitted).

6

Typical CGL policies broadly protect an insured business from liability for all bodily injury and property damage resulting from accidents and then list exclusions from that coverage. *See Hoang v. Assurance Co. of Am.*, 149 P.3d 798, 802 (Colo. 2007). DCP argues that if Higby had obtained the CGL policy required by the Contract, the policy would have indemnified DCP for its negligence in damaging the crane. It would then follow that Higby could not successfully sue DCP because under Colorado law a "party who agrees to procure the insurance and fails to do so assumes the position of the insurer and, thus, the risk of loss." *Richmond v. Grabowski*, 781 P.2d 192, 194 (Colo. App. 1989). And if Higby could not recover against DCP for DCP's negligence, then neither could National because "the subrogated insurer [has] no greater rights than the insured." *United Fire Grp. ex rel. Metamorphosis Salon v. Powers Elec., Inc.*, 240 P.3d 569, 573 (Colo. App. 2010) (internal quotation marks omitted).

Plaintiffs respond by asserting that the CGL policy required by the Contract would not have covered DCP's liability for the damage to the crane. They advance two arguments in support of their assertion: (1) the policy would not cover negligence of DCP that injures Higby because the CGL policy was only to cover claims from third parties—that is, parties other than Higby and DCP, and (2) the policy would not cover the loss because the loss was not caused by "Higby's actions in performing its work," Aplee. Br. at 13. We are not persuaded. As we proceed to explain, the Contract is ambiguous regarding what specific coverage the CGL policy would have to provide. Perhaps the policy would not cover DCP's negligence in this case; perhaps it would. Additional

7

evidence concerning the parties' understanding of the CGL requirement may show that the contemplated policy would not have provided coverage, but case law suggests that CGL policies issued in similar circumstances may well have provided coverage here.

To begin with, we note the imprecision of the Contract's description of the required CGL policy. Paragraph 9.1 states: "Throughout the term of this Agreement [Higby] shall carry and pay for . . . Commercial General Liability Insurance covering . . . liabilities for loss of or damage to property . . . . This insurance must cover all operations of [Higby] required to fulfill this Agreement." Aplt. App. at 71. And ¶ 9.2 provides: "The insurance policies described above shall include [DCP], its affiliates and coventurers, and their directors, officers, and employees as additional assureds. All insurance required hereunder and provided by [Higby] shall be primary coverage." *Id.* at 72. What does it mean to make DCP an additional insured under a policy that "must cover all operations of [Higby] required to fulfill this Agreement"? Clearly the liability must relate to Higby's operations, but in what way?

One clue may be found in common CGL policies. Absent other evidence of intent, one can assume that the required CGL policy would have typical provisions. An important source for standard language is the Insurance Services Office, Inc. (ISO). The ISO has been described by the Supreme Court as "an association of approximately 1400 domestic property and casualty insurers, . . . [which] is the almost exclusive source of support services in this country for CGL insurance. [It] develops standard policy forms and files or lodges them with each State's insurance regulators; most CGL insurance

8

written in the United States is written on these forms." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 772 (1993) (citation omitted). Although the ISO has at least one form with alternative language, in 2008 (when the crane was damaged) most insurers apparently used an additional-insured endorsement that extended coverage to liability "arising out of the named insured's operations." Jeffrey W. Stempel, *Insurance Interpretation: Nevada Supreme Court Adds Its Voice to the Emerging Chorus of Giving Broad Construction to Commonly Used "Additional Insured" Endorsements*, 16 Nev. Law 31, 33 (July 2008) (internal quotation marks omitted). Thus, one possible reasonable interpretation of the contractual requirement is that Higby was to procure a CGL policy that covered DCP's liability "arising out of [Higby's] operations." Indeed, Plaintiffs used "arising from" language in district court, contending that the Contract required only "coverage for [Higby's] liability arising from its operations." Aplt. App. at 154 (bolding omitted).

If we then look at court decisions interpreting CGL coverage with this additional-insured language, we see that such coverage could well encompass DCP's liability to Higby. A particularly informative and instructive decision of the Southern District of New York probably suffices by itself to show the possibility (a possibility sufficient to defeat Plaintiffs' summary-judgment motion) that the CGL policy contemplated by the Contract would have protected DCP. In *Liberty Mutual Fire Insurance Co. v. E.E. Cruz & Co., Inc.*, 475 F. Supp. 2d 400, 402–03 (S.D.N.Y. 2007), as here, the additional insured sought coverage for its liability for damage to the named insured's property at the work

9

site. The City of New York had contracted with TAP Electrical Contracting Service, Inc. (TAP) to provide electrical systems for a project to install 15 large sewage retention tanks. The City and others negligently caused millions of gallons of sewage to flood the project site, damaging TAP's installed electrical components as well as its equipment and uninstalled components stored at the site. *See id.* at 403. The contract between TAP and the City required TAP to obtain CGL insurance that named the City as an additional insured and protected the City from "claims for property damage . . . which may arise from operations under [the] contract, whether such operations are performed by [TAP] or anyone directly or indirectly employed by [TAP]." *Id.* at 404. TAP obtained a CGL policy from Liberty Mutual that included an additional-insured endorsement providing:

> Who is insured is amended to include as an insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured *only with respect to liability arising out of your ongoing operations* performed for that insured.

*Id.* (emphasis added) (internal quotation marks omitted). Liberty Mutual paid TAP for its losses (coincidentally, TAP had also obtained property-loss policies from Liberty Mutual) and then sued the City as TAP's subrogee. *See id.* at 403.

The legal issue relevant to the case before us is whether the CGL policy covered the City's liability to TAP. *See id.* at 407–12. The insurer raised two arguments against coverage that parallel Plaintiffs' arguments here. First, it argued that the policy was only to protect the City against claims by third parties, not TAP. *See id.* at 407. TAP (just as

10

Higby here) was the named insured and the City (just as DCP here) was an additional

insured. The court rejected the argument, explaining that "agreements requiring that a

party procure a policy protecting another party from liability and the resulting additional

insured endorsements in commercial general liability policies are not construed to

preclude coverage for the additional insured against claims of negligence by the named

insured against the additional insured." *Id.* at 408. Second, the insurer argued that

"damage sustained to TAP's equipment and installed and uninstalled electrical

components at the Project sites [did not arise] *from the performance of TAP's ongoing*

*operations*, under the terms of the TAP CGL Policy." *Id.* It asserted that "the mere

presence of property and materials [like a crane parked at the National Helium plant]

does not fall within the policy's definition of 'operations,' which instead requires some

'action' by TAP." *Id.* at 407 (internal quotation marks omitted). The court rejected this

argument as well, noting that *arising out of* is construed broadly under New York law "in

general liability insurance contracts." *Id.* at 409. The court said that it did not matter that

TAP was not actively working when the injury occurred because the term *ongoing*

*operations* in the additional-insured endorsement means "operations under the Contract

occurring prior to the completion of the work contracted for." *Id.* at 411. The mere

"presence of TAP's equipment and installed and uninstalled electrical components at the

job site," said the court, "is part of the performance of TAP's obligation" under the

contract. *Id.* The court explained that it was immaterial that "the occurrence was

allegedly unrelated to TAP's work under the Contract" because New York law provides

11

coverage even when the cause of the harm "had *nothing* to do with the named insured's work for the additional insured." *Id.* (brackets and internal quotation marks omitted).

Perhaps we could ignore *Liberty Mutual* if it were contrary to the great weight of authority. But it is not. First, it is not an isolated ruling in holding that additional-insured coverage under a CGL policy extends beyond protection against liability to third parties. In *Capstone Building Corp. v. American Motorists Insurance Co.*, 67 A.3d 961, 968–70 (Conn. 2013), the University of Connecticut procured a CGL policy to cover itself, the general contractor, and others for construction on a student housing complex. The general contractor claimed coverage under the policy when the university sued it for negligent work. *See id.* at 971–72. Although exclusions in the policy greatly limited the contractor's coverage, *see id.* at 982–86, the court saw "no basis in the language of the [CGL] policy for limiting coverage to liability for harm to third parties. . . . [T]he definition of 'property damage' in the commercial general liability policy does not differentiate between damage to the contractor's work and damage to other property." *Id.* at 976 (brackets and internal quotation marks omitted). And in *Feldman v. Transcontinental Insurance Co.*, No. 01-95-00362-CV, 1996 WL 15619, *4 n.4 (Tex. Ct. App. Jan. 18, 1996), *aff'd in part, rev'd in part on other grounds sub nom. CU Lloyd's of Tex. v. Feldman*, 977 S.W.2d 568 (Texas 1998), the court wrote:

> CU Lloyd's . . . argues . . . that claims by the named insured against an
> additional insured are not covered, and thus no duty to defend was even
> triggered. CU Lloyd's cites no authority for its position. In the absence of
> an "insured versus insured" exclusion clause, we have not found any court
> that has interpreted the "additional insured officer and director" language in

> a standard commercial general liability policy to exclude coverage for an additional insured when sued by the named insured.

The rule extending liability coverage to claims by the named insured has also been widely adopted for automobile liability policies. *See* 7A Steven Plitt et al., Couch on Insurance § 107:15 (3d ed. 2005) ("Absent any exclusionary language to the contrary, a named insured under an automobile liability policy may maintain a direct action to recover from the insurer for injuries caused by the negligent operation of the insured car by an omnibus insured."); *Estate of Sodorff v. United S. Assurance Co.*, 980 F. Supp. 1004, 1007 (W.D. Ark. 1997) ("The majority of authority permits recovery [on the insurance policy] to the named insured [when named insured is negligently injured by a permissive driver]."); *Broy v. Inland Mut. Ins. Co.*, 233 S.E.2d 131, 133 (W. Va. 1977) (similar). We need not worry about whether there is also contrary authority (although none has been cited to us). The point is only that the language in the Contract is imprecise enough to include a CGL policy that would cover liability of one insured to another.

*Liberty Mutual* also is not an outlier in holding that additional-insured coverage for liability arising out of an insured's ongoing operations can encompass harm to the insured's equipment passively sitting at the work site, even when caused by conduct unrelated to the insured's work. (We recognize that the Contract used the term *operations*, not *ongoing operations*; but, if anything, *ongoing operations* is narrower than *operations*.)

13

The language *arising out of* has been construed broadly. Couch on Insurance explains:

> The phrase[] ["arising out of" is] generally considered to mean "flowing from" or "having its origin in." Accordingly, use of these phrases does not require a direct proximate causal connection but instead merely requires some causal relation or connection. Courts have split on where "arising out of" falls on the causation scheme with some courts finding it equivalent to "but for" causation and others finding it somewhere between "but for" causation and proximate causation.

7 Steven Plitt et al., *supra* § 101:52 (footnotes omitted); *see, e.g.*, *McIntosh v. Scottsdale Ins. Co.*, 992 F.2d 251, 255 (10th Cir. 1993) (interpreting Kansas law to say that "arising out of" requires more than but-for causation but less than proximate cause).

Where Colorado law fits on the spectrum is not entirely clear. But some clues appear in a decision of the Colorado Court of Appeals. In *Travelers Property Casualty Co. v. Farmers Insurance Exchange*, 240 P.3d 521, 523 (Colo. App. 2010), the court addressed coverage under a commercial-liability policy that protected an additional insured (a shopping center) from "liability that arises out of a commercial tenant's use of leased premises." *Id.* at 522 (internal quotation marks omitted). The issue was whether the policy protected the shopping center from liability to someone who had visited the tenant's restaurant and then was injured when she slipped on ice in the shopping center's parking lot. *See id.* The court said that coverage "depends on the nexus between the covered property and the injuries complained of and on whether the injury would not have occurred 'but for' the use of the insured property." *Id.* at 523. In particular, "[t]he party seeking coverage must show that except for the use of the insured property, the

14

accident or incident in question would never have taken place." *Id.* at 523–24 (brackets and internal quotation marks omitted). The court denied coverage, explaining:

> Here, customer's patronage of the restaurant was not integrally related to her injury at the time of the accident. Her visit to the restaurant did not expose her to any increased risk of falling in the parking lot. It was not necessary for her to visit the restaurant in order to come in contact with the ice hazard. The parties concede that she could have visited another store, and never visited the restaurant, yet still have walked into the parking lot, encountered the ice hazard, and fallen. Moreover, customer could have avoided the ice by taking a different path from the restaurant to her car. Thus, her visit to tenant's premises was not the "but-for" cause of injury.

*Id.* at 524.

We recognize that we cannot infer from a decision denying coverage that in some other particular situation coverage would be found. But it is significant that the grounds for denial in *Travelers* do not apply to the damage to Higby's crane. The question in *Travelers* was whether the restaurant patron was exposed to injury only because she had visited the restaurant. The answer was no because (1) she could have been exposed to the danger if she had been attracted to the shopping center by another merchant and (2) she could have visited the restaurant and not been exposed to the danger. Here, though, the crane was exposed to the fire because, and only because, it was on the site to perform work under the Contract. Nothing else would have attracted it to the site; and its work location was at the point of danger. In our view, *Travelers* suggests that there was a sufficient causal relation between Higby's operations and the fire damage to the crane to say that the fire damage "arose out of" Higby's operation.

15

Further, *Liberty Mutual* is not alone in extending the concept of "operations" to encompass the positioning of equipment. In *FH Martin Construction Co. v. Secura Insurance Holdings, Inc.*, No. 289747, 2010 WL 1873087 (Mich. Ct. App. May 11, 2010), the issue was whether an injury resulting from a ladder left in place at a construction site by a subcontractor arose "out of ongoing operations" of the subcontractor even though the subcontractor was not using the ladder at the time. The general contractor, FH Martin Construction Company (FH Martin), had hired the subcontractor to provide construction services. *See id.* at *1. The subcontractor's CGL policy named FH Martin as an additional insured but "only with respect to liability arising out of [the subcontractor's] ongoing operations performed for [FH Martin]." *Id.* at *3 (internal quotation marks omitted). The ladder had been used by the subcontractor but was locked and chained in place while the subcontractor spent several days performing work inside the building. *See id.* at *1. A man not employed by the subcontractor had been hired to pour new sidewalks. *See id.* Because he needed to move the ladder to complete his work, he climbed the ladder and cut the chain; the ladder shifted and he fell. *See id.*

On appeal "the only issue [was] whether the liability at issue arose out of [the subcontractor's] ongoing operations performed for FH Martin." *Id.* at *3 (internal quotation marks omitted). The insurer argued that "there was no evidence that [the injured man's] fall arose out of [the subcontractor's] operations, which must be distinguished from the provision of equipment." *Id.* at *2. The court disagreed. *See id.*

16

at *4.  It explained that the ladder had been placed against the building to facilitate the subcontractor's operations and constituted ongoing operations until it completed the work even though its "operations moved from the roof to the interior of the store." *Id.*  "[T]he phrase arising 'out of your ongoing operations,'" said the court, "plainly encompasses the placement and securing of the ladder." *Id.*  One could make a similar comment about Higby's crane.  *See also Colo. Cas. Ins. Co. v. Safety Control Co., Inc.*, 288 P.3d 764, 773 (Ariz. Ct. App. 2012) (injury caused when automobile collided with concrete barriers at road construction site arose out of barrier supplier's ongoing operations even if its employees were not maneuvering the barriers at the time because supplier was obligated to remove the barriers after road construction was complete); *Duininck Bros., Inc. v. Howe Precast, Inc.*, No. 4:06-CV-441, 2008 WL 4372709, at *8 (E.D. Tex. Sept. 19, 2008) (same).

The only case cited by Plaintiffs as supporting a narrower view of the term *operations* is *Weitz Co., LLC v. Mid-Century Insurance Co.*, 181 P.3d 309, 313 (Colo. App. 2007).  *Weitz* cited the dictionary definition of *operation* as "'a doing or performing esp. of action:  WORK, DEED.'"  *Id.* at 313 (quoting Webster's Third New International Dictionary 1581 (2002)).  In the context of that case, however,  nothing really turned on the precise language of the definition.  A general contractor was named as an additional insured on a subcontractor's CGL policy "but only with respect to liability arising out of [the subcontractor's] ongoing operations performed for [the general contractor]." *Id.* at 311 (emphasis and internal quotation marks omitted).  Two years after the subcontractor

17

completed its work, the property owner sued the general contractor for alleged construction defects. *See id.* The insurer argued that the policy did not provide coverage "because the endorsement was limited to 'ongoing operations' and, therefore, did not include coverage for claims arising out of the subcontractor's completed work or operations." *Id.* (internal quotation marks omitted). The court agreed, stating that "the term 'ongoing operations' used in conjunction with 'only' in the endorsement limits the coverage," *id.* at 313, and did not include "completed operations," *id.* at 315 (internal quotation marks omitted). The critical word was *ongoing*, not *operations*. *Weitz* does not discuss what constitutes *operations* before the contract has been completed and therefore has little relevance to our case.

Finally, we decline to address two arguments by Plaintiffs that we must construe any ambiguity in the Contract against DCP. First, Plaintiffs argue on appeal (although they did not argue the point in district court) that we must construe any ambiguities in the Contract against the drafter. Under Colorado law, however, courts should first seek to derive the parties' intent from the plain language of the contract, and if this is not possible, they should then resort to "extrinsic evidence from which [the parties'] intent may be inferred." *Moland v. Indus. Claim Appeals Office*, 111 P.3d 507, 511 (Colo. App. 2004). Only after these methods fail may a court, "as a last resort," construe ambiguities against the drafter. *Id.* We should not rely on this interpretive rule before the parties have had a chance to put on evidence of their intent. Second, Plaintiffs invoke Colorado law that an agreement indemnifying a party against its own negligence must be expressed

18

clearly and unequivocally. *See Constable v. Northglenn, LLC*, 248 P.3d 714, 716 (Colo. 2011). But they cite no authority applying this proposition to additional-insured provisions in contracts, *cf. Exide Corp. v. Millwright Riggers, Inc.*, 727 N.E.2d 473, 482 (Ind. App. 2000) (rule of strict construction of indemnification agreements does not apply to agreements to obtain insurance), nor have they addressed whether the rule applies to this particular contract, *see Constable*, 248 P.3d at 716 (the rule does not ordinarily apply to contracts between sophisticated parties of equal bargaining power). We therefore leave the issue for the district court to resolve in the first instance.

Because Plaintiffs have not met their burden to show that the Contract unambiguously supports their position, we must reverse the grant of summary judgment and remand to the district court. On remand the district court is not limited to the arguments made on appeal when considering whether the CGL policy contemplated by the Contract would protect DCP against liability to Higby. For example, it may consider (1) the applicability of Colo. Rev. Stat. Ann. § 13-21-111.5 (West 2007), which voids some contracts requiring the purchase of insurance, and (2) the observation that "CGL policies often contain an exclusion for damage to property owned by the insured in order to prevent the CGL policy from serving as a property insurance policy," *Hoang v. Assurance Co. of Am.*, 149 P.3d 798, 802 (Colo. 2007).

## III.  CONCLUSION

We REVERSE the grant of summary judgment and REMAND for further proceedings.